1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF NEW YORK
 2

 3      FUJIFILM NORTH AMERICA           ) Civil Action
        CORPORATION,                     ) No. 16-5677 (BMC)
 4                                       )
                        Plaintiff,       ) ORAL ARGUMENT
 5                                       )
        vs.                              ) Brooklyn, New York
 6                                       ) Date:  October 4, 2018
        ABESONS CORP., et al,            ) Time:  2:15 p.m.
 7                                       )
                        Defendants.      )
 8      _____

 9                 TRANSCRIPT OF ORAL ARGUMENT
                         HELD BEFORE
10            THE HONORABLE JUDGE BRIAN M. COGAN
                  UNITED STATES DISTRICT JUDGE
11      _____

12                     A P P E A R A N C E S

13      For the Plaintiff:        Robert L. Maier, Esq.
                                  Peter L. Menchini, Esq.
14                                Suzanne M. Hengl, Esq.
                                  Baker Botts LLP
15                                30 Rockefeller Plaza
                                  New York, New York  10112
16                                212-408-2538

17      For the BFG Defendants:   Ronald D. Coleman, Esq.
                                  Jennifer E. Presti, Esq.
18                                Mandelbaum Salsburg
                                  1270 Avenue of the Americas
19                                Suite 1808
                                  New York, New York  10020
20                                212-776-1834

21      (Appearances continued on the next page.)

22


23      Court Reporter:       Annette M. Montalvo
                              Official Court Reporter
24                            Eastern District of New York
                              Office: 718-804-2711

25
```

2

APPEARANCES:   (Continued)


        For the Goldex and        Jonathan Ross, Esq.
        Tri-State Defendants:     Feldman Law Group, PC
                                  220 East 42nd Street, Suite 3304
                                  New York, New York  10017
                                  212-532-8585
                                          -and-
                                  Theodore C. Anderson, Esq.
                                  Kilgore & Kilgore, PLLC
                                  3109 Carlisle Street
                                  Dallas, Texas  75204
                                  214-679-8820


        ALSO PRESENT:  Marc Hirschfeld


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

3

1          (WHEREUPON, commencing at 2:19 p.m., the following

2    proceedings were had in open court, to wit:)

3          THE COURTROOM DEPUTY:  *Fujifilm North America v. Big*

4    *Value, Inc., et al.*, Docket No. 16-CV-5677.

5          Counsel, please state your appearances, starting for

6    the plaintiff.

7          MR. MAIER:  Good afternoon, Your Honor.  Robert

8    Maier, for the plaintiff, from Baker Botts.  Also with me are

9    Suzanne Hengl and Peter Menchini.

10          THE COURT:  Hi.

11          MR. COLEMAN:  Ronald Coleman and Jennifer Presti for

12    the BFG defendants.

13          THE COURT:  Hi.

14          MR. ROSS:  Jonathan Ross, Feldman Law Group, for

15    Goldex and Tri-State defendants.  And also with me today is

16    Ted Anderson, who's also appeared for those defendants.

17          THE COURT:  You're just visiting, right?

18          MR. ANDERSON:  Ted Anderson.  Yes, I just appeared,

19    Judge.

20          THE COURT:  No, but, I mean, you and your clients

21    aren't really involved in what we're talking about today?

22          MR. ANDERSON:  No.  No, Your Honor.

23          THE COURT:  Okay.  Well, thank you for coming

24    anyway.

25          I have some questions for you.  As I understand it,

4

1   when you ran the terms "Fuji" and "Instax," you got about

2   15,000 documents, right?

3          MR. COLEMAN:  Yes, Your Honor.

4          THE COURT:  You can sit down, if you want.  You can

5   stand or sit, whatever you want.

6          Why didn't you turn over the 15,000 documents?

7          MR. COLEMAN:  Because they were not all responsive.

8          THE COURT:  Let them worry about it.  Is there

9   something in there you need to protect?

10         MR. COLEMAN:  No, actually, there's -- first of all,

11  when I say -- I am speaking "we" in an organizational sense.

12  I wasn't there.  But my understanding was that manual review

13  is going to be necessary.  You need to review for privilege,

14  no matter what.  So the filtering process is meant to reduce

15  the amount of manual review that's necessary.

16         THE COURT:  If there were millions of pages, I can

17  understand that.  But 15,000 pages, why do a further cut?

18  15,000 pages is probably a couple of days of associate time to

19  review.

20         MR. COLEMAN:  I must say that I -- I don't have an

21  answer.  It might be possible.  Mr. Hirschfeld, who was there,

22  could answer that question.

23         THE COURT:  Is he here?

24         MR. COLEMAN:  Yes.

25         THE COURT:  You're former counsel, right,

5

1    Mr. Hirschfeld?

2              MR. HIRSCHFELD:  I am not.

3              MR. COLEMAN:  No, he's the e-discovery vendor.

4              THE COURT:  Okay.  Well, I may have questions for

5    him.  Why don't you come up in case I do.

6              MR. COLEMAN:  Can he sit at counsel table?

7              THE COURT:  Yes, sure.

8              But, you know -- and, Mr. Hirschfeld, I'm sure

9    you've seen this.  15,000 documents, that's a pinhead compared

10   to what you're used to dealing with, right?  That's not a lot

11   of documents.

12             MR. HIRSCHFELD:  My understanding was that there was

13   sensitive information in there.  Client names.  That's what

14   they were most concerned about.

15             THE COURT:  We have protective orders for that.  I

16   mean, even if there's all that stuff in there, it is just not

17   a lot of documents, and I think the whole problem comes

18   about -- frankly, I am not sure even that using "Fuji" and

19   "Instax" were sufficient to accommodate all the information.

20   But once you reduce it even further, the odds are you're

21   definitely going to miss something.

22             Let me ask this question:  Did the plaintiffs have

23   any input as to the search terms at all?  Maybe I should ask

24   them.

25             Did you?

6

1        MR. MAIER:  Your Honor, our understanding is that at

2   least as was initially represented to us, they took the search

3   terms that we ran against our documents and used those to also

4   search against their documents, which doesn't necessarily make

5   sense, but that's what was represented to us some time ago.

6        THE COURT:  Okay.  That's wrong, right?

7   Mr. Hirschfeld is nodding because he knows that's not how it's

8   done.  He was just following orders, and that's what they told

9   him to do.

10        MR. COLEMAN:  Yeah.  I am not trying to pin this on

11   him.

12        THE COURT:  Yeah.  No, I understand.  Everyone's

13   going to pin it on former counsel because former counsel isn't

14   here to defend himself --

15        MR. COLEMAN:  I'm not going to pin it on them

16   either.  They're working with a client that is obsessed with

17   the confidentiality of their -- that's what it all is.  You

18   know, that's, frankly, you know, it's as if there's this idea

19   that there's this 4-D chess game, where if the order -- if

20   FNAC would know what -- this competitive information or would

21   become part of the record on some motion practice, then their

22   business would collapse immediately thereafter --

23        THE COURT:  But a good lawyer will tell them we have

24   attorneys eyes only protective orders, we have court sealing,

25   we have contempt of court if anyone violates it, and they will

7

1    convince the clients that they are not at risk.  What they

2    won't do is say, "Okay, let's do this, Mr. Hirschfeld.  Let's

3    just run the same terms they ran, on the assumption that we

4    keep our records in exactly the same way that they keep their

5    records, and, therefore, what it good enough for them is good

6    enough for us."  And that's just wrong.

7           MR. COLEMAN:  One thing I can say, though, based on

8    my familiarity with the client, and with the documents, is

9    that unlike in the case where Your Honor is thinking of the

10   true document case, where lots and lots of commercial -- or

11   relevant or responsive transactions, communications, take

12   place by e-mail, that's not the case with this business.  This

13   is -- in other words, they have automated systems in place,

14   they process orders, they sell, they buy, they sell, they buy,

15   they sell, they buy.  The employees are not meant to spend a

16   lot of time sending e-mails.  And the fact is that the issues

17   that -- the specific issues that FNAC has raised here, the --

18   no.  The differences -- material differences which evidently

19   that the premise of this motion was, this is -- the e-mails

20   from Ms. Goldberg would have demonstrated -- which were

21   produced actually, that the person who had responsibility for

22   administering complaints would have been missed here.  If

23   there would have been a complaint about a product, Fuji or

24   Instax would have been in such an e-mail.  But there's no

25   reason to believe that they wouldn't.

8

1          THE COURT:  I guess that's right.  At least Fuji

2  probably.  And if not Fuji, then probably Instax.

3          Let me ask the plaintiff this.

4          MR. COLEMAN:  Can Mr. Hirschfeld be heard?

5          THE COURT:  Yes.

6          MR. HIRSCHFELD:  One additional piece.  I was

7  involved with a lot of redaction work that was done on these

8  documents.  And there was the same e-mails over and over and

9  over again.  There were solicitation e-mails that had people's

10 names in the e-mail address, and it took hours and hours to go

11 through the details and the top, the bottom, the middle.  It

12 was like six or seven places where these names showed up.

13 Most of the work that was involved in this was redaction work.

14 Looking through pricing lists, and only taking the Fuji

15 pricing list, and then reverting Canon to remove those and

16 some of the other companies that they work with.

17         So most of the work that was involved here was

18 really on redactions, which even on the most simple cases, the

19 small amount of data, it takes the most time, those

20 redactions.

21         THE COURT:  Not that much.  I mean, look.  As I

22 said, if you had millions of pages, as I am sure you've had in

23 other cases, then, yes, I could understand that.  15,000

24 documents?  This is why I want to ask the plaintiff, if you've

25 gotten the 15,000, is it your view that searching for the

1    terms "Fuji" or "Instax" would be adequate?

2            MR. MAIER:  No, Your Honor.

3            THE COURT:  Why?

4            MR. MAIER:  For a couple of reasons.  So -- and if I

5    can get into that by addressing a comment Mr. Coleman made,

6    which is that there aren't many e-mails in this business, one

7    of the things they have said, in fact, Mr. Hirschfeld said in

8    his declaration, is that the universe of documents was so very

9    large, so difficult for them to process, that they needed to

10   first make this cut internally for "Fuji" and "Instax."  So

11   someone at the company, who, as we understand it, is not an IT

12   person, we don't know how he did this, but someone at the

13   company gathered all of the e-mails, concluded it was too

14   many, and then did his own search at the company for "Fuji"

15   and "Instax."  So even Mr. Hirschfeld has never actually seen,

16   as we understand it, the full universe of documents.

17           That being said, to Your Honor's question, a search

18   for "Fuji" and "Instax" doesn't get us there because it omits

19   a number of things that they should have done.

20           THE COURT:  Like what?

21           MR. MAIER:  There's things they should have searched

22   for.  Two of the digital camera products at issue here are

23   called FinePix and X Series.  If they're internally referring

24   to these cameras, we wouldn't pick those up in that search.

25   Similarly, they had internal code names for certain things.

1   For example, for the gray market, Your Honor, they use the

2   term "G" for gray market, okay.  We learned that in documents.

3   And it turns out now, as we see it, they didn't search that.

4   They didn't search their only internal code name for gray.

5   They didn't search "FUJ," which is the way that they indicate

6   Fujifilm products internally.

7        THE COURT:  Did you attempt to come to an agreement

8   with their prior counsel on which search terms to use?

9        MR. MAIER:  We did, Your Honor.  We reached out.

10  There was quite a bit of back and forth.  We finally reached

11  out, and what they explained to us was they ran the same

12  search terms we ran.

13       Now, we didn't know about this first cut that they

14  made.  So that's the first important point here.  What they

15  represented was that they ran the same search terms.  And they

16  represented that to us back then, Your Honor, and they

17  represented that to us in September of this year, September

18  20.  In their letter to us on this very issue, they said we

19  ran the search terms you ran.

20       But it turned out, when we saw Mr. Hirschfeld's

21  declaration, paragraph 11, he said, quote:  We determined that

22  it would be too costly and difficult to process the client's

23  entire e-mail server to run the search terms provided by Fuji,

24  closed quote.  So that was a misrepresentation back then in

25  the June 2017 search.  They didn't do what they told us they

1    did.

2           So there are problems with the terms they chose,

3    Your Honor, there were problems with what was represented to

4    us.  And that brings me to the last problem, Your Honor, which

5    in our view is maybe even more significant, which is twice

6    they were ordered to go back and find documents.  Twice.

7           There were several motions to compel filed.  Four

8    times they've been sanctioned.  In fact, most recently they

9    were sanctioned in response to plaintiff's motion in limine

10   number 2 --

11          THE COURT:  I know.  I was there.

12          MR. MAIER:  Your Honor, you know the record as well

13   as I do.

14          So four times they were sanctioned.  How do they not

15   go back and search again?  The documents at issue in those

16   motions to compel were customer communications.  E-mails.

17   E-mails about things like warranties and repair and return.

18   And as Your Honor knows, those are the most critical evidence

19   in this case.  Those e-mails go directly to material

20   differences, to consumers care about these things.

21          THE COURT:  All right.

22          MR. MAIER:  So how are they twice ordered, go do

23   better, go find more, and they don't even look again for those

24   documents.  By the way, their initial search for those

25   documents didn't capture "warranty."  If you look at the

1   terms, I think the way they narrowed it was they searched

2   "warranty" within three terms of "foreign."

3              THE COURT:  I saw.

4              MR. MAIER:  Clearly, that's not going to capture

5   what are the most critical documents in this case.

6              THE COURT:  And I doubt any warranty claim would be

7   referred to as a "foreign warranty."  That would be

8   fortuitous, if it did.  It's a warranty claim.

9              MR. MAIER:  Precisely, Your Honor.

10             And then that brings us to today, where we know they

11  haven't searched for these things -- again, they are not of

12  tangential relevance.  They're the most critical documents in

13  the case.  And, in fact, in summary judgment, one of the

14  arguments they raised is that there weren't very many e-mails.

15  How can you possibly not search for them.  And we had to fight

16  tooth and nail for every page we got in discovery.  And then

17  at the end of the case claim, oh, well, there aren't very many

18  e-mails.  That strikes us as bad faith, Your Honor.

19             THE COURT:  I got it.

20             Mr. Coleman, do you have anything to say about this?

21  I know it is like "not on your watch," in a way.

22             MR. COLEMAN:  I will say what I did say in our

23  letter, though.  I mean, Your Honor elicited some important

24  points in questioning counsel from plaintiff.  One was they

25  were -- there was communication between the two sides about

13

1    what search terms would be used.  Mr. Maier says, "Well, we

2    didn't know that there would be a first cut."

3            I am not aware of any reason why that first cut

4    was -- would have been inappropriate.  He suggested there were

5    other models involved.  Possibly.

6            What our observation throughout the case has been is

7    that references to these products inevitably refer to the

8    brand.  And Mr. Hirschfeld reminds me that these search terms

9    for the warranty were, in fact -- came up with hits.

10   Evidently, this usage was not as arcane as one might otherwise

11   think.

12           THE COURT:  How can you respond to request number

13   29, which asks for warranties or guarantees, without running

14   against the entire database warranties or guarantees?

15           MR. COLEMAN:  Because warranty -- well, it would --

16   the fact that they made a request doesn't mean it was -- that

17   the scope of the request was appropriate.  And I am sure there

18   was an objection interposed.  There were rulings --

19           THE COURT:  If there was, it wouldn't have been

20   sustained, because it is perfectly proper in this case to ask

21   for the documents concerning warranties and guarantees.

22           MR. COLEMAN:  Well, warranties and guarantees

23   concerning this product.

24           THE COURT:  This product by its various names or the

25   parallel products as used -- as referred to by the defendants.

14

1          MR. COLEMAN:  Right.  That's right.  But not the

2    entire database, including the other 20 or 30 brands.  So

3    that's why the attempt evidently was made to narrow the

4    universe.  I would say also that the point -- you know,

5    they -- counsel was aware that this was the list that was

6    used.  There might be some question about whether or not the

7    initial culling of "Fuji" and "Instax" was appropriate.  That

8    may be the case.  But with respect to the fine points of what

9    search terms were used, they were aware what was used, and in

10   each subsequent production where no more e-mails were

11   produced, they were aware that no more e-mails were produced.

12   So to come two weeks before trial and say, why weren't more

13   e-mails produced, doesn't -- you know, discovery's over.  They

14   knew there were no more e-mails produced, and if they thought

15   there was an issue -- you know, this is not a situation where

16   we have a testimony by someone in this case that leads us to

17   believe that a particular communication was not produced, or a

18   particular location or particular file was not opened up.

19          This is just -- in Canon, there was a motion.  We

20   have a problem on summary judgment, which is that we don't

21   have a lot of proof about material differences.  So let's go

22   to town on material differences, you know, in this case.  The

23   fact is that we produced e-mails that did go to complaints

24   from consumers.  We produced e-mails that did go to erroneous

25   accessory shipments.

15

1              And the idea that either my office or my predecessor

2     would -- or our client, for that matter, would say, let's

3     produce ten out of a hundred, I mean, that's -- first of all,

4     there's no basis for it, it is speculative.  And second of

5     all, it's -- there's no particular reason why this is an

6     appropriate inquiry during a -- at this stage.  In other

7     words, the premise of this -- of the timing of this hearing is

8     something happened in the Canon case.

9              THE COURT:  Excuse me.  Your client or your

10    predecessors, maybe you, had certified repeatedly that all

11    responsive e-mails had been produced.  What are they supposed

12    to do?  Run to court and say, "We disagree, we don't know."

13    They got the Canon information, and that's what tipped them

14    off that the search was inadequate.  Otherwise, they are

15    allowed to accept you at your word.

16             MR. COLEMAN:  Their original -- the -- we started

17    this process off with a complaint that Canon -- there's

18    someone whose e-mails weren't produced in Canon.  And what

19    they didn't tell you in that initial letter was that that

20    person's e-mails were produced in this case.

21             THE COURT:  Some.  Some.

22             MR. COLEMAN:  All that we're aware.

23             THE COURT:  We don't know.

24             MR. COLEMAN:  We are not aware any other exists.

25    And we certainly looked for them since --

16

1          THE COURT:  Ten or 15, right?

2          MR. COLEMAN:  Right.  Because that's not -- this is

3    not e-mail business, and --

4          THE COURT:  You don't know if it is or if it isn't,

5    because no one's done an adequate search.  I mean, I take your

6    word for it, I'm sure your clients are telling you, "Gee, we

7    don't use e-mails for anything other than receiving orders and

8    sending out orders."  But we don't know.  And because the

9    search terms that were used on both the first cut and the

10   second cut are so palpably inadequate, we either take your

11   client's word for it, or we don't know.  And we don't -- we

12   are not supposed to take your client's word for it when the

13   search terms are not adequate.

14         As I said at the very beginning, we are not talking

15   about -- and I have been in cases as a lawyer where there were

16   three million pages of documents.  That's just -- this is

17   small stuff that could have been easily done.

18         All right.  My ruling is this:  The defendants, not

19   even referencing their counsel, but the defendants have not

20   acted in good faith in meeting their discovery obligations.

21   The plaintiffs were not unduly delayed in calling that to my

22   attention.  They have been trying to get production throughout

23   this case.  I have ordered it.  Those orders should have

24   caused the defendants to redouble their efforts to make sure

25   that they had adequate terms and were finding things.  I have

1  heard enough in this hearing to know that under any

2  combination of the terms that were searched, it wasn't going

3  to be nearly adequate, and it certainly isn't adequate now.

4          So I am finding a willful violation.  I am not sure

5  at this point what remedy I am going to impose.

6          The two that I am thinking of, and I am not going to

7  decide now, but I will give you a chance to send me a

8  supplemental letter.  It is either going to be a mandatory or

9  a permissive adverse inference instruction to the jury.  The

10  jury will be instructed that the defendants failed to meet the

11  obligations imposed on them by law and by this Court in this

12  action in looking for documents dealing with the question of

13  materiality.  I am going to tell them that.

14          And then I am going to say to them, either you must,

15  therefore, presume that there are documents showing that, in

16  fact, there are no -- there are material differences, or else

17  I may say to them, you may, but are not required to presume

18  that there are no material differences.  I am not sure which

19  way I am going to go on that.

20          The only possible way out, and I think this is a

21  very small needle, I hesitate to even raise it for the

22  defendants, but I really -- I am reluctant to impose these

23  kind of sanctions.  If you go back and do the right search,

24  and give them the right results, and they have enough time,

25  which is where I think there's a problem, to analyze the

1   additional documents you give them, or if you show that

2   despite an adequate search, there really isn't much else

3   beyond what you have already given them, then I might not give

4   such an instruction and permit or require the jury to draw an

5   adverse inference.

6           I don't know if you can do it.  If you can't -- you

7   don't have to explain to me that you can't.  This is like an

8   option to you.

9           MR. HIRSCHFELD:  It is my business, I would love to

10  do it.

11          THE COURT:  I understand.

12          MR. HIRSCHFELD:  If we can get that first cut, a

13  listing of the search terms that opposing counsel would like

14  on a first cut and a second cut, I think that would be really

15  helpful.

16          THE COURT:  Can do you that?

17          MR. MAIER:  We probably could, Your Honor, but may I

18  raise two concerns that we have?

19          THE COURT:  Yes.

20          MR. MAIER:  One is time.  As Your Honor has pointed

21  out, this case has gone on for two years.  Fujifilm wants this

22  activity to stop, so they don't want to delay this trial, and

23  I believe we're ten days from trial at this point.

24          The second point is, I've got to say, that when we

25  get this far down the path of what appears to us to be clear

1  bad faith in discovery, at some point we start to worry about

2  what's being done, what has been done.  We start to wonder

3  about spoliation, and I don't know that we can have any

4  confidence at this point, and this is not directed at

5  Mr. Coleman or Mr. Hirschfeld, but I don't know that we can

6  have any confidence that the BFG defendants are going to

7  comply and turn over all these documents at this point.

8          MR. HIRSCHFELD:  Your Honor, if -- my idea here was

9  if we do these searches, and I certify the searches myself

10 personally, so I would go --

11         THE COURT:  How do you know that the client is

12 giving you complete access to their databases?

13         MR. HIRSCHFELD:  I would go in myself and do it.

14 I've testified as a computer forensic --

15         THE COURT:  How do you know?  What if they say,

16 "look here," and there's also "there"?

17         MR. HIRSCHFELD:  That's a possibility in every case.

18         THE COURT:  That's true.

19         MR. HIRSCHFELD:  But what I do --

20         THE COURT:  What's different in this case is I have

21 already found bad faith.

22         MR. HIRSCHFELD:  I understand.  What I could do is I

23 could lay out exactly the process that I have done to locate

24 responsive data, and I have done this in many cases where

25 clients did not want to give me data, and I find it.  That's

1  what my job is, to find it.

2          THE COURT:  All right.

3          MR. HIRSCHFELD:  I am not going to do it in

4  forensic, like start copying thousands of computers, but I am

5  taking about the mail server and locating all archives of that

6  mail server, et cetera.  That kind of work.

7          THE COURT:  All right.

8          MR. HIRSCHFELD:  In addition, if we run those search

9  terms and we yield a certain amount of data, and we see that

10 it is similar in size to what we have had already, and we have

11 already reviewed that data, my goal here is that there's a few

12 more documents.  Yes, there may be several thousand more

13 documents that need to be looked at.  But if we have a good

14 first cut and a good second cut search term list, then,

15 hopefully, the amount of data is not large enough that --

16         THE COURT:  Mr. Hirschfeld, with all due respect,

17 you have no way of knowing.

18         MR. HIRSCHFELD:  I have no way of knowing.

19         THE COURT:  And for that reason, I'm sorry I raised

20 the possible alternative.  Because as I mull it over, it seems

21 to me it is just not practical for the reason plaintiff's

22 counsel has outlined.  Which is, basically, this is not a

23 defendant that can be trusted.  And as you say,

24 Mr. Hirschfeld, in every case you are at the client's -- you

25 are at the mercy of the client's good faith.  If the client

1  wants to hide things, you are not a fraud examiner that can

2  find those things.  You might coincidentally stumble upon the

3  fact, I am sure you have, that there are documents the client

4  didn't identify to you, but we would have to count on this

5  defendant to now, after all this, ten days before trial, come

6  clean.

7           And I am not going to do that.  So I withdraw that

8  suggestion.  And the only question on the table is whether

9  there should be a permissive or mandatory adverse inference

10  drawn on the issue of materiality.  I will think about that.

11  You want to write me another letter, you can let me know.  I

12  will get that decided as soon as I can.

13           Anything else?

14           MR. COLEMAN:  We'd certainly like to be heard on

15  that issue, if we have the opportunity.

16           THE COURT:  Write me a letter.

17           MR. COLEMAN:  Today is Thursday.

18           THE COURT:  Whenever you get it to me.

19           MR. COLEMAN:  Okay.

20           MR. ANDERSON:  Judge, on behalf of Goldex, would

21  there also be an instruction to the jury that no such finding

22  applies to our client?

23           THE COURT:  I haven't thought about that yet.  I

24  mean, obviously, the instruction would not be defendants

25  collectively, it would only be as to this defendant.  "This

22

1  defendant failed in their discovery obligations."  Whether I

2  have to additionally say, "and this defendant did not," I

3  don't know.  We will talk about that at trial.

4          MR. ANDERSON:  Thank you.

5          THE COURT:  Okay.  Thank you.  We're adjourned.

6          (WHEREUPON, at 2:45 p.m., the proceedings were

7  concluded.)

8

9

10

11

12                      * * * * *

13          **REPORTER'S CERTIFICATE**

14          I, ANNETTE M. MONTALVO, do hereby certify that the

15  above and foregoing constitutes a true and accurate transcript
    of my stenographic notes and is a full, true and complete

16  transcript of the proceedings to the best of my ability.

17          Dated this 9th day of October, 2018.

18  /s/Annette M. Montalvo
    Annette M. Montalvo, CSR, RDR, CRR

19  Official Court Reporter

20

21

22

23

24

25